**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
UNITED STATES OF AMERICA,                )
                                                          )
                              Plaintiff,         )
                                                          )
              v.                                      )        **Civil Action No. 1:12-CV-1230 (KBJ)**
                                                          )
UNITED TECHNOLOGIES CORPORATION    )
                                                          )
              and                                     )
                                                          )
GOODRICH CORPORATION,                      )
                                                          )
                              Defendants.      )
_____)

## <u>MEMORANDUM OPINION</u>

The United States of America (the "government") brings this case against United

Technologies Corporation ("UTC") and Goodrich Corporation ("Goodrich") for antitrust

violations arising out of UTC's acquisition of Goodrich.  The government alleges that the

"acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act,

15 U.S.C. § 18, in the worldwide markets for the development, manufacture, and sale of large

main engine generators, aircraft turbine engines, and engine control systems for large aircraft

turbine engines."  (Competitive Impact Statement at 1-2.)  Presently before the Court is the

Motion and Memorandum of the United States in Support of Entry of Final Judgment ("U.S.

Mem."), which would permit the acquisition to proceed subject to conditions intended to remedy

the antitrust violations alleged in the complaint.  For the reasons stated below, and after

consideration of the motion and accompanying memoranda, the government's motion is

GRANTED.

BACKGROUND

This case is governed by the procedures set forth in Section 2(b) of the Antitrust

Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (2006), also known as the Tunney Act.  The

government initiated this action on July 26, 2012, by filing the above-described complaint.

Simultaneously with the filing of the complaint, the government filed both a proposed Final

Judgment and a "Hold Separate Stipulation and Order" in which the parties consented to entry of

the proposed Final Judgment after compliance with the procedural requirements of the Tunney

Act.  The government also filed a Competitive Impact Statement ("CIS"), which details the

government's antitrust concerns about the acquisition and explains how the proposed Final

Judgment remedies the alleged anticompetitive impact of the acquisition.

## I.      Proposed Merger and Alleged Competitive Harms

UTC and Goodrich both produce a wide range of products for the aerospace industry.

(CIS at 3.)[1]  On September 10, 2011, UTC and Goodrich entered in an agreement by which UTC

will acquire Goodrich for approximately $18.4 billion.  (*Id.* at 1.)  The government alleges that

this acquisition will lessen competition in the following three markets: (1) large main engine

generators; (2) aircraft turbine engines; and (3) engine control systems for large aircraft turbine

engines.  (*Id.* at 2.)  The gravamen of the government's complaint is that UTC's acquisition of

Goodrich will result in increased prices, less favorable contractual terms, and decreased

innovation in the market for each of these products.  (*Id.*)  The Court will consider each market,

and the alleged anticompetitive effect, in turn.

---

[1] UTC is incorporated in Delaware and headquartered in Hartford, Connecticut.  UTC's annual revenues from products for aerospace and other industries are approximately $54 billion.  (Compl. ¶ 6.)  Goodrich is incorporated in New York and headquartered in Charlotte, North Carolina.  (*Id.* ¶ 7.)  Goodrich entered into a venture that led to development of variable-frequency main engine generators for large aircraft more than a decade ago, and in 2010, Goodrich had revenues of $7.2 billion.  (*Id.*)

A.  <u>Large Main Engine Generators</u>

First, the government alleges that the acquisition will lessen competition substantially in the market for the development, manufacture, and sale of large main engine generators.  Main engine generators convert mechanical energy into electrical energy, which is used to run a variety of in-flight systems, including the mechanisms that pump breathable air into the main body of the airplane, turn on lights, and run navigation and communication equipment in the cockpit.  (Compl. ¶¶ 11-12.)  The size of the aircraft dictates the amount of power required from the generator as well as the types of systems used on the airplane; for those reasons, the design and function of generators differ for large and small aircraft.  (CIS at 15.)  Large main engine generators are complex and generally difficult to design.  (*Id.* at 16-19.)

The complaint alleges that UTC and Goodrich are the only significant competitors in the large main engine generator market.  (Compl. ¶¶ 26, 30.)  UTC and Goodrich were the top two bidders in almost every competition for large main engine generators in the past twelve years, and one of the two companies has won the bid in every competition during this time frame.  (*Id.* ¶ 26.)  Moreover, UTC and Goodrich often plan bids in consideration of "the possibility of losing sales of large main engine generators to the other" (*id.* ¶ 27).

The government also maintains that companies that manufacture main engine generators for other types of aircraft lack the capability to compete effectively with UTC and Goodrich.  (*Id.* ¶ 31.)  This is, in part, because large main engine generators are more complicated than other types of aircraft generators.  (*Id.* ¶¶ 30-31, 36.)  In addition, it is unlikely that any new competitors will enter this market in a way that could dampen the anti-competitive effect of the acquisition for two primary reasons: first, because the aerospace industry tends to purchase large main engine generators from suppliers with experience in this particular market, not from new companies (*id.* ¶ 34); and second, because potential new competitors likely would be dissuaded

by the huge amount of time and financial investment required to produce this product  (*id.* ¶¶ 36-37).  The government alleges that even if a new competitor makes such an investment, the effect is likely to be too slow and too small to lessen the competitive impact of this acquisition.

      B.   <u>Aircraft Turbine Engines</u>

Second, the government alleges that the acquisition will lessen competition substantially in the market for the development, manufacture, and sale of aircraft turbine engines, both large and small.  (Compl. ¶ 14.)  Aircraft turbine engines, which power most aircraft, operate by burning a mixture of fuel and air in a combustion chamber, and using the resulting products to turn either a propeller blade, rotor shaft, or fan, depending on the type of engine.  (*Id.* ¶ 39.)  The complaint alleges that there are only three main producers for large aircraft turbine engines and that UTC and Rolls-Royce are two of them.  (*Id.* ¶ 44.) [2]  The complaint does not allege an exact number of producers of small aircraft turbine engines, but notes that there are "only a few."  (*Id.* ¶ 45.)

Because of the complexity of aircraft turbine engines, a computer system (called an engine control system ("ECS")) is used to run them.  (*Id.* ¶ 46.)  ECS software is designed to accommodate a particular engine, so it contains confidential business information about each engine.  (*Id.* ¶¶ 47-48.)  Goodrich and Rolls-Royce formed Aero Engine Controls ("AEC"), a joint venture to produce ECSs.  (*Id.* ¶ 49.)  As part of the joint venture, Rolls-Royce is required to purchase all ECSs for large aircraft turbine engines from AEC.  (*Id.* ¶ 49.)  By the same terms, Goodrich does all the servicing on the ECSs for Rolls-Royce large aircraft turbine engines while they are in use.  (*Id.*)

If UTC acquires Goodrich, then UTC will be the sole supplier of ECSs to its main competitor, Rolls-Royce.  (*Id.* ¶ 62.)  The government's concern is that this position creates an

---

[2] UTC's production of large aircraft turbine engines is through its Pratt & Whitney subsidiary.  (Compl. ¶ 44.)

incentive and ability to withhold or delay delivery of ECSs to Rolls-Royce, and to raise costs in the long-term maintenance and servicing required.  (*Id.* ¶ 63.)  This arrangement will also give UTC access to confidential information, through the ECS software, about pricing and components of Rolls-Royce's engines, which will give UTC an unfair advantage.  (*Id.* ¶¶ 66-67.) The complaint also alleges that UTC will have the ability and incentive to withhold ECSs in order to force customers to purchase engines from UTC instead of Rolls-Royce.  (*Id.* ¶¶ 72-74.)

For reasons similar to those discussed above regarding large main engine generators— including the complexity of the product, the great financial and time investments, and customers' preference for engines from proven sources—the complaint alleges that new competitors are unlikely to enter the market for aircraft turbine engines in any meaningful way.  (*Id.* ¶¶ 77-79.)

C.   Engine Control Systems for Large Aircraft Turbine Engines

Finally, the government alleges that the acquisition will lessen competition in the market for ECSs for large aircraft turbine engines.  (Compl. ¶ 80.)  ECSs are not sold separately from the engines themselves.  (*Id.* ¶ 81.)  Most purchasers have "preferred suppliers."  (*Id.* ¶ 88.)  The complaint alleges that there are only three significant suppliers of ECSs: UTC and AEC (the Goodrich—Rolls-Royce joint venture) are two of them.  (*Id.* ¶ 83.)  If UTC acquires Goodrich, UTC will control AEC, leaving only one competitor in the ECS field.  (*Id.* ¶ 87.)  The government's concern is that after the acquisition, UTC will have the incentive and ability to stop AEC from providing ECSs to the other turbine engine companies that are in competition with UTC.  (*Id.* ¶ 88.)

The complaint alleges that sufficient, timely entry of new competitors into the ECS market is unlikely because it takes several years and millions of dollars to develop an ECS, and even if such investment were made, sales would be low because most engine purchasers already have preferred suppliers.  (*Id.* ¶¶ 91-92.)

## II.     Proposed Remedy

Under the proposed Final Judgment, UTC is required to divest assets in three categories: Engine Controls Divestiture Assets, Electrical Power Divestiture Assets, and Goodrich's shares in joint ventures.  (CIS at 23-28.)  The CIS and the Final Judgment list the exact assets subject to divestiture in each of the three areas.  Most of the assets are to be divested to a party chosen by the defendants and acceptable to the United States.  (U.S. Mem. at 10, 17.)[3]

For assets in each of the three affected markets, the proposed Final Judgment includes a variety of mechanisms intended to ensure successful divestiture.  The Final Judgment requires: (1) that the divested assets include intangible assets, such as licenses for intellectual property (CIS at 24; Final J. ¶¶ II(M)(5)-(6)); (2) that the parties enter transition services agreements whereby "UTC will provide technical and engineering assistance, and maintenance, repair, and overhaul services to the acquirer" (CIS at 30-31; Final J. ¶¶ IV(H) & V(L)); and (3) that the parties have the option to enter supply agreements to ensure acquirers of divestiture assets continue to receive necessary products (CIS at 31; Final J. ¶¶ IV(I) & V(M)).

The proposed Final Judgment provides that if defendants do not accomplish the divestiture within the period allowed, the Court will appoint a government-selected trustee, at UTC's expense, to complete the divestiture.  (CIS at 35.)  The proposed Final Judgment also specifies that this Court retains jurisdiction to enter "any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment."  (*Id.* at 39.)

## III.     Public Comments

In further compliance with the Tunney Act, the government published the proposed Final Judgment and the CIS in the Federal Register.  (U.S. Mem. at 3 (citing *United States v. United*

---

[3] Certain assets subject to divestiture are to be acquired by specific parties; for example, Goodrich's shares in the AEC joint venture are to be divested to Rolls-Royce (CIS at 29; Final J. ¶ VI(A)).

*Tech. Corp.*, 77 Fed. Reg. 46,186 (Aug. 2, 2012)).)  As required, the government also published

the proposed Final Judgment and the CIS in *The Washington Post* for seven consecutive days.

(U.S. Mem. at 3.)  Sixty days were then allowed for public comment on the proposed Final

Judgment.  (*Id.*)  Two comments were received during that time, and the government published

both of the comments, and also its response, in the Federal Register.  *See United States v. United*

*Tech. Corp.*, 78 Fed. Reg. 22,302 (Apr. 15, 2013).

The first comment came from Williams International ("Williams"), a competitor of UTC

in the small aircraft turbine engine business.  (Resp. of Pl. United States to Public Comments on

the Proposed Final J. ("U.S. Resp.") at 8.)  Williams identified three main concerns with the

proposed Final Judgment, and the government responded to each one.  Williams's first concern

arose from its status as a customer of the assets that are to be divested under the agreement, and

amounted to a complaint that the remedies spelled out in the Final Judgment did not adequately

shield confidential or proprietary customer information from UTC or any potential acquirer.  (*Id.*

at 9.)  The government responded that the proposed Hold Separate Stipulation and Order and the

proposed Final Judgment both require that customer information be kept separately and

confidentially from other UTC operations.  (*Id.* at 10-11.)  As for protecting this information

from potential acquirers of the divested assets, the government responded that while some

customer information may be shared during an acquiring company's due diligence investigation,

this is not only typical, but often required.  (*Id.* at 11.)

Next, Williams expressed a general concern about the sole discretion given to the

government to review and approve proposed acquirers of the divested assets.  (*Id.* at 9.)  The

government responded that its review was thorough, far-reaching and "include[d] consideration

of information from numerous sources, including affected customers."  (*Id.* at 12.)  Moreover, to

support its contention that the investigation of proposed acquirers was "no mere cursory review[,]" the government revealed that "the United States [had already] rejected the first acquirer proposed by the defendants" for a portion of the divestiture assets.  (*Id.* at 12-13.)

Finally, Williams complained that the proposed Final Judgment did not adequately safeguard the divestiture assets pending their sale, referring to both physical assets and personnel.  (*Id.* at 10.)  In response, the government noted that multiple provisions of the Final Judgment address defendants' obligation to maintain and support the physical assets (*id.* at 13 (citing Final. J. ¶¶ V.D-F)), while the Hold Separate Stipulation and Order sufficiently ensured retention of employees (*id.* (citing Hold Separate Stip. & Order at § V.J)).

The second comment came from Joseph C. Jefferis, a former Goodrich employee.  Mr. Jefferis's comment centered on past allegations that Goodrich had violated various other laws outside the antitrust context and also expressed his concern that the acquisition may result in a monopoly in a certain fuel cell technology.  (U.S. Resp. at 14-15.)  Responding to Mr. Jefferis, the government noted that most of his concerns were unrelated to the anticompetitive effects of UTC's proposed acquisition of Goodrich.  (*Id.* at 15.)  The government further noted that it had not found any evidence that the acquisition would have an anticompetitive effect in fuel cells.  (*Id.* at 15-16.)[4]

---

[4]  In addition to this public comment, the Court also received two letters from Mr. Jefferis related to this case.  In a letter dated April 29, 2013, Mr. Jefferis seeks recusal of Bill Baer, a Department of Justice attorney formerly employed at Goodrich, and also requests an independent assessment of the UTA-Goodrich merger. As Mr. Baer is not involved in this case, the Court will not address whether recusal would be needed, nor does the Court believe any additional investigation is needed apart from the government's assessment.  The Court also received a May 13, 2013, letter from Mr. Jefferis asking this Court to unseal and subpoena the transcript of a 2009 FBI interview pertaining to insider trading allegations at Goodrich.  These requests are outside of the antitrust context; therefore, they are not properly submitted and the Court will not address them.

ANALYSIS

**I.     The Tunney Act's Requirements**

The Tunney Act requires that the government satisfy certain procedural requirements, which include: (1) publishing the proposed Final Judgment and CIS in the Federal Register; (2) publishing a summary of both of these documents for seven consecutive days in a local newspaper; (3) accepting and responding to public comments during a sixty day window following publication; and (4) publishing both the comments and the response in the Federal Register.  15 U.S.C. § 15(b)-(d).  This Court finds, based on the facts related above, that the Tunney Act's procedural requirements have been met in this case.

Pursuant to the Tunney Act, the court must also "determine that the entry of judgment is in the public interest."  15 U.S.C. § 16(e)(1).  The Tunney Act does not define "public interest," but it does direct the Court to consider the following factors when making the public interest determination:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive consideration bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of these issues at trial.

15 U.S.C. § 16(e)(1).[5]

---

[5] Some courts in this district have used the following factors as the test for the public interest determination: whether "the terms appear ambiguous, if the enforcement mechanism is inadequate, if third parties will be positively injured, or if the decree otherwise makes a mockery of judicial power."  *See, e.g.*, *United States v. Humana Inc.*, No. 12-cv-00464 (RBW), 2012 WL 7170464, at *2 (D.D.C. Oct. 22, 2012) (citing *Massachusetts v. Microsoft Corp.*, 373 F.3d

In considering these factors, the Court makes only a "narrow" inquiry in to the merits of the consent decree, *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1236 (D.C. Cir. 2004), and "may not reject a remedy simply because it may not be, in the court's view, the 'best' remedy available." *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000).   Indeed, the court need only conclude that a proposed final judgment falls somewhere "within the reaches of the public interest." *United States v. W. Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990) (citation, internal quotation marks & emphasis omitted).  This is because "review of a proposed final judgment is highly deferential" to the government's assessment of the proposed remedial measures.  *United States v. Humana Inc.*, No. 12-cv-00464 (RBW), 2012 WL 7170464, at *2 (D.D.C. Oct. 22, 2012); *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15 (D.D.C. 2007) (citing *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995)) (interpreting the D.C. Circuit's instruction that district courts "be deferential to the government's predictions as to the effects of the proposed remedies").

For its part, "[t]he government must demonstrate only that the settlement is a reasonably adequate remedy for the harms alleged in the complaint." *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (citing *United States v. Abitibi-Consol. Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008)); *see also SBC Commc'ns*, 489 F. Supp. 2d at 15-16 (citing *Microsoft*, 56 F.3d at 1461) ("Accordingly, the relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable.").  Where "[t]here is a clear and logical relationship between the allegations set forth in the government's complaint and its proposed remedies[,]" then the

---

1199, 1236 (D.C. Cir. 2004)).  After the 2004 amendments to the Tunney Act, however, "these factors along with others are explicitly enumerated in the Tunney Act's text, and must *all* be considered by the Court." *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 12-13, 16 (D.D.C. 2007) (emphasis added).

proposed Final Judgment is in the public interest.  *United States v. AT&T Inc.*, 541 F. Supp. 2d 2, 7 (D.D.C. 2008).

## II.      The Proposed Final Judgment Is In The Public's Interest

The proposed Final Judgment seeks to lessen the competitive impact of UTC's acquisition of Goodrich in the markets for large main engine generators, aircraft turbine engines and ECSs for large aircraft turbine engines by requiring UTC to divest the Engine Controls Divestiture Assets, Electrical Power Divestiture Assets, and shares of certain joint ventures. (CIS at 25-27.)  "There is a clear and logical relationship between the allegations set forth in the government's complaint and its proposed remedies," *AT&T*, 541 F. Supp. 2d at 7, and the Court is generally satisfied that the government has met its burden of establishing that the proposed settlement is reasonably adequate to address the identified harms.

Moreover, when the proposed Final Judgment is viewed in light of the specified statutory "public interest" factors, the proposed settlement is clearly nestled "within the reaches of the public interest."  *See W. Elec. Co.*, 900 F.2d at 309.  The terms of the proposed Final Judgment are purposefully designed to address the "competitive impact" of the acquisition, and they appear to be sufficient to achieve that result.  The terms of the proposed Final Judgment are clear, and the provisions for enforcement of the divestiture are adequate, as evidenced by the fact that UTC had already divested the assets to approved acquirers by the time the government's motion was filed.  (U.S. Mem. at 8.)  The proposed Final Judgment also makes explicit that this Court retains jurisdiction for future modifications.  (CIS at 39.)  Furthermore, the government expressly considered proceeding to a full trial on the merits as an alternative remedy, but found that the divestiture would achieve substantially all of the same relief with significantly less time, expense, and uncertainty.  (CIS at 39.)  *Cf. SBC Commc'ns*, 489 F. Supp. 2d at 23 (noting that

the consent decree, not trial, was in the public interest because "[s]uccess at trial was surely not assured, so pursuit of that alternative remedy may have resulted in no remedy at all").

The two objections filed during the public comments period fail to raise significant concerns about whether entry of the proposed Final Judgment is in the public's interest. Although additional and more explicit protections of confidential customer information could be added to the proposed Final Judgment, the Court's role is not to determine what the best remedy is, but whether the chosen remedy is "reasonable."  *SBC Commc'ns*, 489 F. Supp. 2d at 15 (quoting *Microsoft*, 56 F.3d at 1460).  The Court finds that the government has provided reasonable explanations for its chosen confidentiality-related provisions, and the proposed Final Judgment need not be rejected for want of heightened restrictions or additional provisions regarding maintenance of assets pending acquisition.  In addition, the fact that the government has already rejected a company that sought to acquire certain assets (U.S. Resp. at 12-13), underscores the conclusion that the government's investigation of this matter has been sufficiently thorough and fact-intensive.

Finally, the Court finds that it was appropriate for the government not to alter the proposed Final Judgment in light of Mr. Jefferis's concerns.  Mr. Jefferis's public comment does not address the anticompetitive behavior alleged in the complaint, and the settlement need not address it.  *See Humana*, 2012 WL 7170464, at *2 ("[T]he proposed final judgment must remedy only the anticompetitive behavior alleged in the complaint and it must not go beyond that.") (citing *Microsoft*, 56 F.3d at 1459).

CONCLUSION

For the reasons set forth above, the Court finds that the proposed Final Judgment is in the

public interest.  The government's unopposed Motion for Entry of Final Judgment is therefore

GRANTED, and the proposed Final Judgment shall be entered by separate order.


Date:   May 29, 2013                        _____/s/_____
                                            KETANJI BROWN JACKSON
                                            United States District Judge