## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff | |
| v. | CASE NO.:  1:12-CV-01230-KBJ |
| UNITED TECHNOLOGIES CORPORATION | |
| and | |
| GOODRICH CORPORATION | |
| Defendants | |

## <u>FINAL JUDGMENT</u>

WHEREAS, Plaintiff, United States of America, filed its Complaint on July 26, 2012, the United States and Defendants United Technologies Corporation ("UTC") and Goodrich Corporation ("Goodrich"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights and assets by Defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures and make certain commitments for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.      JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties to this action.  The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II.     DEFINITIONS

As used in this Final Judgment:

A.      "Acquirer" or "Acquirers" means the entity or entities to which Defendants divest the Divestiture Assets.

B.      "Acquirer of the Electrical Power Divestiture Assets" means the entity to which Defendants divest the Electrical Power Divestiture Assets.

C.      "Acquirer of the Engine Control Divestiture Assets" means the entity to which Defendants divest the Engine Control Divestiture Assets.

D.      "Acquirer of the AEC Shares" means Rolls-Royce or another entity to which Defendants divest the AEC Shares.

E.      "Acquirer of the Aerolec Shares" means Thales or another entity to which Defendants divest the Aerolec Shares.

F.      "UTC" means Defendant United Technologies Corporation, a Delaware corporation with its headquarters in Hartford, Connecticut, its successors, assigns, subsidiaries, divisions, groups, affiliates, and partnerships, and their directors, officers, managers, agents, and employees.

G.      "Goodrich" means Defendant Goodrich Corporation, a New York corporation with its headquarters in Charlotte, North Carolina, its successors, assigns, subsidiaries, divisions, groups, affiliates, and partnerships, and their directors, officers, managers, agents, and employees.

H.      "Rolls-Royce" means Rolls-Royce Group plc, a company incorporated in England and Wales with a registered office in London, its successors, assigns, subsidiaries, divisions, groups, affiliates, and partnerships, and their directors, officers, managers, agents, and employees.

I.      "Thales" means Thales Avionics Electrical Systems SA, a company incorporated in France with a registered office in Neuilly-Sur-Seine, France, its successors, assigns, subsidiaries, divisions, groups, affiliates, and partnerships, and their directors, officers, managers, agents, and employees.

J.      "West Hartford Facility" means Goodrich's facility located at Charter Oak Boulevard, West Hartford, Connecticut  06133.

K.      "Montreal Facility" means Goodrich's facility located at 5595 Royalmount Avenue, Montreal H4P 1J9 QU, Canada, which will be transitioned to the West Hartford Facility.

L.      "Engine Control Products" means all Goodrich products and services that are designed, developed, manufactured, marketed, serviced, distributed, repaired, and/or sold out of or using the assets located in the West Hartford Facility and/or the Montreal Facility on the date the Complaint is filed in this matter, including but not limited to electronic engine controls, fuel metering units, main fuel pumps, and ancillary engine control products (including but not limited to, engine actuators, ejector pumps and tanks, hot oil valves, shut-off valves, flow dividers, start flow control valves, lube pumps, and lube and scavenge pumps).  Engine Control Products exclude maintenance, repair, and overhaul services currently performed at the Montreal Facility for the following:  (1) products designed specifically to be used on the Rolls-Royce Tay and Spey engines; (2) products designed specifically to be used on the General Electric F404 engine; (3) products designed specifically to be used on the Pratt & Whitney PW305 engine; and (4) the servo actuator and yaw damper product lines.

M.      "Engine Control Divestiture Assets" means:

(1)      The West Hartford Facility and all tangible and intangible assets used by or located in the West Hartford Facility;

(2)      All tangible and intangible assets used by or located in the Montreal Facility that are used to design, develop, manufacture, market, service, distribute, repair, and/or sell Engine Control Products;

(3)     All tangible assets, wherever located, that are used to design, develop, and/or manufacture Engine Control Products, including, but not limited to, assets relating to research and development activities, manufacturing equipment, tooling, fixed assets, personal property, inventory, office furniture, materials, supplies, licenses, permits, authorizations issued by any governmental organization, contracts, teaming arrangements, agreements, leases, commitments, certifications, supply agreements, understandings, customer lists, contracts, accounts, credit records, information technology systems, and repair, performance, and other records; and

(4)     All intangible assets, wherever located, that are used to design, develop, and/or manufacture Engine Control Products, including, but not limited to, contractual rights, patents, licenses, sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures, quality assurance and control procedures, design tools, simulation capability, manuals and technical information provided to Goodrich employees, customers, suppliers, agents, or licensees, and research data concerning historic and current research and development efforts, including, but not limited to, designs of experiments and results of successful and unsuccessful designs and experiments;

(5)     for intellectual property that is used exclusively for Engine Control Products that is owned and/or controlled by Goodrich, but for which Goodrich's

ownership or control is in any way encumbered, an exclusive, irrevocable, royalty-free license for that intellectual property; and

(6)     for intellectual property that is used primarily, but not exclusively, for Engine Control Products that is owned and/or controlled by Goodrich, but for which Goodrich's ownership or control is in any way encumbered, a non-exclusive, irrevocable, royalty-free license for that intellectual property.

N.     "Qualifying Customer Contracts" means any contract or agreement: (1) having an initial duration of longer than two years; (2) for the supply of any Engine Control Products to turbine engine manufacturers; (3) to which the business comprising the Engine Control Divestiture Assets is a party; (4) that are unexpired on the date the Complaint is filed in this matter; (5) the term of which will expire prior to the date of the consummation of the divestiture of the Engine Control Divestiture Assets; and (6) which have not been renegotiated prior to such consummation.

O.     "Twinsburg Facility" means Goodrich's facility located at 8380 Darrow Road, Twinsburg, Ohio 44087.

P.     "Pitstone Facility" means Goodrich's facility located at Pitstone Business Park, Westfield Road, Pitstone, Buckinghamshire LU7 9GT, United Kingdom.

Q.     "Electrical Power Divestiture Assets" means:

(1)     The Twinsburg Facility;

(2)     The Pitstone Facility, provided, however, that the assets used exclusively for the motor drive business located at the Pitstone Facility shall not be divested pursuant to this Final Judgment;

6

(3)     All tangible assets that are used to design, develop, manufacture, market, service, distribute, repair, and/or sell aircraft electrical generation systems and electrical distribution systems that currently are or have been designed, developed, manufactured, marketed, serviced, distributed, repaired, and/or sold by Goodrich Engine Control and Electrical Power Systems, including, but not limited to, assets relating to research and development activities, manufacturing equipment, tooling, fixed assets, personal property, inventory, office furniture, materials, supplies, licenses, permits, authorizations issued by any governmental organization, contracts, teaming arrangements, agreements, leases, commitments, certifications, supply agreements, understandings, customer lists, contracts, accounts, credit records, information technology systems, and repair, performance, and other records;

(4)     All intangible assets that are used to design, develop, manufacture, market, service, distribute, repair and/or sell aircraft electrical generation systems and electrical distribution systems that currently are or have been designed, developed, manufactured, marketed, serviced, distributed, repaired, and/or sold by Goodrich Engine Control and Electrical Power Systems, including, but not limited to, contractual rights, patents, licenses, sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures, quality assurance and control procedures, design tools, simulation capability, manuals and technical information provided to Goodrich employees, customers, suppliers, agents, or licensees, and research data concerning historic and current research and development

7

efforts, including, but not limited to, design of experiments and results of successful and unsuccessful designs and experiments;

(5)     all intellectual property and know-how that is owned by Goodrich pursuant to the Intellectual Property Agreement between TRW Limited and Thales dated June 27, 2001; and

(6)     Goodrich's obligations to BAE Systems pursuant to the Norwegian Sting Ray Mod 1 Torpedo System Programme Procurement Specification and Sub Contract for the Power Supply (5000) Section and Motor Control (6000) Section 296401001/01-02 Issue 1, dated April 30, 2009 and all assets necessary to fulfill those obligations.

The Electrical Power Divestiture Assets exclude assets in or personnel operating out of Goodrich's development center located in Bengaluru, India and Goodrich's MRO Campuses.

R.     "Goodrich's MRO Campuses" means all Goodrich facilities, except the Twinsburg Facility and the Pitstone Facility, from which customer support for Goodrich's aircraft electrical generation systems and electrical distribution systems products is provided.

S.     "Aerolec Shareholders Agreement" means the Shareholders' Agreement dated May 31, 2001, between TRW France Holding SAS, TRW Limited, and Thales.

T.     "Aerolec Shares" means all shares of TRW-Thales Aerolec SAS that are owned and/or controlled by Goodrich, TRW France Holding SAS, and/or TRW Limited that were acquired pursuant to the Aerolec Shareholders Agreement.

U.     "Change of Control Option" means Thales's option to acquire the Aerolec Shares pursuant to section 7.2(H) of the Aerolec Shareholders Agreement.

V.     "Transfer Option" means Thales's option to acquire the Aerolec Shares pursuant to section 7.2(E) of the Aerolec Shareholders Agreement.

W.     "AEC Joint Venture Agreement" means the Joint Venture Agreement dated December 31, 2008, between Rolls-Royce Engine Controls Holdings Limited, Rolls-Royce Group plc, Goodrich Controls Holding Limited, Goodrich Actuation Systems Limited, Goodrich Corporation, and Rolls-Royce Goodrich Engine Control Systems Limited.

X.     "AEC" means the joint venture established pursuant to the  AEC Joint Venture Agreement.

Y.     "AEC Shares" means all the shares in AEC that are owned and/or controlled by Goodrich.

Z.     "Goodrich Aftermarket Business" means the worldwide aftermarket business conducted  by Goodrich prior to the date Goodrich is acquired by UTC involving the maintenance, repair, and overhaul of units, equipment, and parts (including hardware and software) that are designed, assembled, manufactured, supported, or procured by AEC, the provision of training and documentation and support equipment, and the sale and supply of spare parts and initial provisioning for engine control systems for Rolls-Royce engines.

AA.     "Divestiture Assets" means the Electrical Power Divestiture Assets, Aerolec Shares, Engine Control Divestiture Assets, and AEC Shares.

## III.    APPLICABILITY

A.      This Final Judgment applies to UTC and Goodrich, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Section IV, Section V, and Section VI of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, Defendants shall require the purchaser(s) to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the Acquirers of the assets divested pursuant to this Final Judgment.

## IV.    DIVESTITURE OF THE ENGINE CONTROL DIVESTITURE ASSETS

A.      Defendants are ordered and directed, within one hundred and eighty calendar days after the filing of the Complaint in this matter, or five calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Engine Control Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this period, not to exceed sixty calendar days in total, and shall notify the Court in such circumstances.  If, however, applications seeking approval to sell the Engine Control Divestiture Assets have been filed within the period permitted for the divestiture of the Engine Control Divestiture Assets with authorities from which approval for the divestiture of the Engine Control Divestiture Assets is required by the Acquirer of the Engine Control Divestiture Assets as a condition of closing, but orders or other dispositive actions by such authorities on such

applications have not been issued before the end of the period permitted for this divestiture, the period shall be extended with respect to the divestiture of the Engine Control Divestiture Assets until ten calendar days after such approvals are received. Defendants agree to use their best efforts to accomplish the divestiture of the Engine Control Divestiture Assets and to seek all necessary approvals as expeditiously as possible.

B.      In accomplishing the divestitures ordered by this Final Judgment, Defendants promptly shall make known, by usual and customary means, the availability of the Engine Control Divestiture Assets.  Defendants shall inform any person making inquiry regarding a possible purchase of any of the Engine Control Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment.  Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Engine Control Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine.  Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C.      Defendants shall provide the Acquirer of the Engine Control Divestiture Assets and the United States information relating to the personnel involved in the design, development, manufacture, marketing, servicing, distribution, repair, and/or sale of Engine Control Products to enable the Acquirer of the Engine Control Divestiture Assets to make offers of employment.  Defendants shall not interfere with any negotiations by

11

the Acquirer of the Engine Control Divestiture Assets to employ any Goodrich employee who is responsible for the design, development, manufacture, marketing, servicing, distribution, repair, and/or sale of Engine Control Products.  Interference with respect to this paragraph includes, but is not limited to, enforcement of non-compete clauses and offers to increase salary or other benefits apart from those offered company-wide.

D.      Defendants shall permit prospective Acquirers of the Engine Control Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities to be divested; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E.      Defendants shall warrant to the Acquirer of the Engine Control Divestiture Assets that each asset included in the Engine Control Divestiture Assets will be operational on the date of sale.

F.      Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Engine Control Divestiture Assets.

G.      Defendants shall warrant to the Acquirer of the Engine Control Divestiture Assets that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Engine Control Divestiture Assets, and that following the sale of the Engine Control Divestiture Assets, Defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of any of the Engine Control Divestiture Assets.

H.      At the option of the Acquirer of the Engine Control Divestiture Assets, UTC shall enter into a transition services agreement with the Acquirer of the Engine

Control Divestiture Assets.  This agreement shall include technical and engineering assistance and maintenance, repair, and overhaul services relating to Engine Control Products.  The terms and conditions of any contractual arrangement meant to satisfy this provision must be commercially reasonable.  The terms and conditions of any such transition services agreement shall be subject to the approval of the United States, in its sole discretion.  The duration of this transition services agreement shall not be longer than one year.  The United States, in its sole discretion, may approve an extension of the term of this transition services agreement for a period of up to one year.  If the Acquirer of the Engine Control Divestiture Assets seeks an extension of the term of this transition services agreement, it shall so notify the United States in writing at least four months prior to the date the transition services agreement expires.  The  United States shall respond to any such request for extension in writing at least three months prior to the date the transition services agreement expires.

I.      At the option of the Acquirer of the Engine Control Divestiture Assets, UTC shall enter into a supply agreement to supply components used in or necessary for the design, development, manufacture, marketing, servicing, distribution, repair, and/or sale of the Engine Control Products sufficient to meet the needs identified by the Acquirer of the Engine Control Divestiture Assets.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to market conditions for these products.  The terms and conditions of any such supply agreement shall be subject to the approval of the United States, in its sole discretion.  The duration of this supply agreement shall not be longer than one year.  The United States, in its sole discretion, may approve an extension of the term of this supply agreement for a

period of up to one year.  If the Acquirer of the Engine Control Divestiture Assets seeks

an extension of the term of this supply agreement, it shall so notify the United States in

writing at least four months prior to the date the supply agreement expires.  The  United

States shall respond to any such request for extension in writing at least three months

prior to the date the supply agreement expires.

J.       At the option of the Acquirer of the Engine Control Divestiture Assets,

UTC shall enter into a supply agreement to supply parts and provide engineering

expertise sufficient to meet the needs identified by the Acquirer of the Engine Control

Divestiture Assets to enable that Acquirer to provide maintenance, repair, and overhaul

services for the following products: engine control unit and fuel pump metering unit for

the AE1107 engine; engine control unit and fuel pump metering unit for the AE3007

engine; engine control unit and fuel pump for the RB211 engine; engine control unit for

the BR710 engine; engine control unit for the PW305 engine; engine control unit for the

Tay engine; fuel metering unit for the Trent 700 engine; fuel metering unit for the Trent

800 engine; and fuel metering unit and actuator for the V2500 engine.  The terms and

conditions of any contractual arrangement intended to satisfy this provision must be

reasonably related to market conditions for these products.  The terms and conditions of

any such supply agreement shall be subject to the approval of the United States, in its

sole discretion.  At the option of the Acquirer of the Engine Control Divestiture Assets,

this agreement may remain in effect so long as three or more of any aircraft equipped

with an engine listed in this paragraph are in service.

K.       At the option of the Acquirer of the Engine Control Divestiture Assets,

UTC shall enter into a supply agreement to supply pressure sensors and transducers for

the Goodrich EMC51, EMC60, and EMC101 electronic engine controls, and any derivatives of those electronic engine controls, sufficient to meet the needs identified by the Acquirer of the Engine Control Divestiture Assets.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to market conditions for these products.  The terms and conditions of any such supply agreement shall be subject to the approval of the United States, in its sole discretion.  At the option of the Acquirer of the Engine Control Divestiture Assets, this agreement may remain in effect so long as five or more aircraft equipped with an electronic engine control listed in this paragraph are in service.  In the alternative, at the option of the Acquirer of the Engine Control Divestiture Assets, UTC shall provide the Acquirer of the Engine Control Divestiture Assets a non-exclusive,  irrevocable, royalty-free license solely to manufacture the pressure sensors and transducers necessary to fulfill the contractual obligations of the Acquirer of the Engine Control Divestiture Assets relating to the Goodrich EMC51, EMC60, and EMC101 electronic engine controls that exist on the date the Engine Control Divestiture Assets are divested.  The Acquirer shall not transfer such license except as part of a sale of the Engine Control Divestiture Assets.

L.     At the option of UTC, the Acquirer of the Engine Control Divestiture Assets shall enter into a supply agreement for parts sufficient to meet the needs identified by UTC to enable UTC to provide maintenance, repair, and overhaul services for the fuel control system for the LF507 engine; the fuel control system and the power turbine governor for the T53 engine; the fuel pump for the LTS101 engine; and the fuel pump for the PW100 engine.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to market conditions for these products.

The terms and conditions of any such supply agreement shall be subject to the approval of the United States, in its sole discretion.  At the option of UTC, this agreement may remain in effect so long as five or more aircraft equipped with an engine listed in this paragraph are in service.

M.     At the option of UTC, the Acquirer of the Engine Control Divestiture Assets shall provide UTC with a non-exclusive license for intellectual property that is included in the Engine Control Divestiture Assets but used for both Engine Control Products and other Goodrich products not being divested pursuant to this Final Judgment. UTC shall not transfer the license described in this paragraph except as part of a sale of the business in which the license is used.  UTC shall not use the license described in this paragraph for engine control products, systems, and services.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to market conditions for these products.  The terms and conditions of any such license shall be subject to the approval of the United States, in its sole discretion.

N.     Defendants shall offer to extend, with the same pricing and other terms and conditions, the Qualifying Customer Contracts for a period expiring thirty calendar days after the date of the consummation of the divestiture of the Engine Control Divestiture Assets.

O.     Unless the United States otherwise consents in writing, the divestiture of the Engine Control Divestiture Assets pursuant to Section IV or by the Divestiture Trustee appointed pursuant to Section VII of this Final Judgment shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Engine Control Divestiture Assets can and will be used by the Acquirer of the Engine Control Divestiture

Assets as part of a viable, ongoing business that is engaged in the design, development, manufacture, marketing, servicing, distribution, repair, and sale of Engine Control Products and that the divestiture of the Engine Control Divestiture Assets will remedy the competitive harm alleged in the Complaint.  The divestiture of the Engine Control Divestiture Assets, whether pursuant to Section IV or Section VII of this Final Judgment, shall be made to an Acquirer that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the design, development, manufacture, marketing, servicing, distribution, repair, and sale of Engine Control Products.  The divestiture of the Engine Control Divestiture Assets shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between the Acquirer of the Engine Control Divestiture Assets and Defendants give Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V.    DIVESTITURE OF THE ELECTRICAL POWER DIVESTITURE ASSETS AND AEROLEC SHARES

A.    Defendants are ordered and directed to divest the Electrical Power Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion, no later than one hundred eighty calendar days after the filing of the Complaint in this matter, or five calendar days after notice of the entry of this Final Judgment by the Court, whichever is later. The United States, in its sole discretion, may agree to one or more extensions of this time period, not to exceed sixty calendar days in total, and shall notify the Court in such circumstances. If, however, applications seeking approval to sell the Electrical Power Divestiture Assets

17

have been filed within the period permitted for the divestiture of the Electrical Power

Divestiture Assets with authorities from which approval for the divestiture of the

Electrical Power Divestiture Assets is required by the Acquirer of the Electrical Power

Divestiture Assets as a condition of closing, but orders or other dispositive actions by

such authorities on such applications have not been issued before the end of the period

permitted for this divestiture, the period shall be extended with respect to the divestiture

of the Electrical Power Divestiture Assets until ten calendar days after such approvals are

received.  Defendants agree to use their best efforts to accomplish the divestiture of the

Electrical Power Divestiture Assets and to seek all necessary approvals as expeditiously

as possible.

   B. Defendants shall remove from the Pitstone Facility prior to the

consummation of the divestiture of the Electrical Power Divestiture Assets all assets used

exclusively for the motor drive business.

   C. If Thales exercises the Change of Control Option, Defendants are ordered

and directed, within one hundred eighty calendar days after the filing of the Complaint in

this matter, or five calendar days after notice of the entry of this Final Judgment by the

Court, whichever is later, to divest the Aerolec Shares to Thales in a manner consistent

with this Final Judgment.  The United States, in its sole discretion, may agree to one or

more extensions of this time period not to exceed sixty calendar days in total, and shall

notify the Court in such circumstances.  Defendants agree to use their best efforts to

divest the Aerolec Shares as expeditiously as possible.

   D. If Thales does not exercise the Change of Control Option, but Thales does

exercise the Transfer Option, Defendants are ordered and directed to divest the Aerolec

Shares to Thales in a manner consistent with this Final Judgment within thirty calendar days after the date Thales notifies UTC that it will exercise the Transfer Option.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty calendar days in total, and shall notify the Court in such circumstances.  Defendants agree to divest the Aerolec Shares as expeditiously as possible.  If Thales does not exercise the Change of Control Option, Defendants further agree to provide notice to Thales pursuant to paragraph 7.2(E) of the Aerolec Shareholders Agreement no later than two business days after the sale of the Electrical Power Divestiture Assets is consummated.

   E.  If Thales does not exercise the Change of Control Option and does not exercise the Transfer Option, Defendants are ordered and directed to divest the Aerolec Shares in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion, within one hundred fifty calendar days after the earlier of:  (1) the date Thales notifies UTC that it will not exercise the Transfer Option; or (2) the time period for Thales to exercise the Transfer Option expires.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty calendar days in total, and shall notify the Court in such circumstances.  If, however, applications seeking approval to sell the Aerolec Shares have been filed within the period permitted for the divestiture of the Aerolec Shares with authorities from which approval for the divestiture of the Aerolec Shares is required by the Acquirer of the Aerolec Shares as a condition of closing, but orders or other dispositive actions by such authorities on such applications have not been issued before the end of the period permitted for this divestiture, the period shall be extended with respect to the divestiture

of the Aerolec Shares until ten calendar days after such approvals are received. Defendants agree to use their best efforts to accomplish the divestiture of the Aerolec Shares and to seek all necessary approvals as expeditiously as possible.

F.     In accomplishing the divestitures ordered by this Final Judgment, Defendants promptly shall make known, by usual and customary means, the availability of the Electrical Power Divestiture Assets.  Defendants shall inform any person making inquiry regarding a possible purchase of any of the Electrical Power Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment.  Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Electrical Power Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine.  Defendants shall make available such information to the United States and any Monitoring Trustee at the same time that such information is made available to any other person.

G.     Defendants shall provide the Acquirer of the Electrical Power Divestiture Assets, the United States, and any Monitoring Trustee information relating to the Goodrich personnel involved in the design, development, manufacture, marketing, service, distribution, repair, and/or sale of aircraft electrical generation systems and electrical distribution systems to enable the Acquirer of the Electrical Power Divestiture Assets to make offers of employment.  Defendants will not interfere with any negotiations by the Acquirer of the Electrical Power Divestiture Assets to employ any Goodrich employee who is responsible for the design, development, manufacture,

marketing, service, distribution, repair, and/or sale of aircraft electrical generation systems and electrical distribution systems.  Interference with respect to this paragraph includes, but is not limited to, enforcement of non-compete clauses and offers to increase salary or other benefits apart from those offered company-wide.  However, interference with respect to this paragraph shall not include acts by Defendants relating to employees of the Pitstone Facility that are necessary to comply with the employment laws of the United Kingdom.

H.      Defendants shall permit prospective Acquirers of the Electrical Power Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities to be divested; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

I.      Defendants shall warrant to the Acquirer of the Electrical Power Divestiture Assets that each asset included in the Electrical Power Divestiture Assets will be operational on the date of sale.

J.      Defendants shall not take any action that will impede in any way the permitting, operation, or divestiture of the Electrical Power Divestiture Assets.

K.      Defendants shall warrant to the Acquirer of the Electrical Power Divestiture Assets that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of each asset included in the Electrical Power Divestiture Assets, and that following the sale of the Electrical Power Divestiture Assets, Defendants will not undertake, directly or indirectly, any challenges to the environmental,

zoning, or other permits relating to the operation of any of the Electrical Power Divestiture Assets.

L.      At the option of the Acquirer of the Electrical Power Divestiture Assets, UTC shall enter into a transition services agreement with the Acquirer of the Electrical Power Divestiture Assets.  This agreement shall include technical and engineering assistance and maintenance, repair, and overhaul services relating to aircraft electrical generation systems and electrical distribution systems.  The terms and conditions of any contractual arrangement meant to satisfy this provision must be commercially reasonable. The terms and conditions of any such transitional services agreement shall be subject to the approval of the United States, in its sole discretion.  The duration of this transition services agreement shall not be longer than one year.  The United States, in its sole discretion, may approve an extension of the term of this transition services agreement for a period of up to one year.  If the Acquirer of the Electrical Power Divestiture Assets seeks an extension of the term of this transition services agreement, it shall so notify the United States in writing at least four months prior to the date the transition services agreement expires.  The  United States shall respond to any such request for extension in writing at least three months prior to the date the transition services agreement expires.

M.      At the option of the Acquirer of the Electrical Power Divestiture Assets, UTC shall enter into a supply agreement to supply components used in or necessary for the design, development, manufacture, marketing, servicing, distribution, repair, and/or sale of aircraft electrical generation systems and electrical distribution systems sufficient to meet the needs identified by the Acquirer of the Electrical Power Divestiture Assets. The terms and conditions of any contractual arrangement intended to satisfy this

provision must be reasonably related to market conditions for these products.  The terms and conditions of any such supply agreement shall be subject to the approval of the United States, in its sole discretion.  The duration of this supply agreement shall not be longer than one year.  The United States, in its sole discretion, may approve an extension of the term of this supply agreement for a period of up to one year.  If the Acquirer of the Electrical Power Divestiture Assets seeks an extension of the term of this supply agreement, it shall so notify the United States in writing at least four months prior to the date the supply agreement expires.  If the United States approves such an extension, it shall so notify the Acquirer of the Engine Control Divestiture Assets in writing at least three months prior to the date the supply agreement expires.

N.      At the option of the Acquirer of the Electrical Power Divestiture Assets, UTC shall enter into a supply agreement to supply machined parts, including machined housings for AC generators and accessory gearboxes for the SAAB Gripen (JAS 39), sufficient to meet the needs identified by the Acquirer of the Electrical Power Divestiture Assets.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to market conditions for these products.  The terms and conditions of any such supply agreement shall be subject to the approval of the United States, in its sole discretion.  At the option of the Acquirer of the Electrical Power Divestiture Assets, the portion of this supply agreement relating to the accessory gearboxes may remain in effect so long as any SAAB Gripen (JAS 39) is in service.  The portion of this supply agreement relating to the machined housings for the AC generators and any other products covered shall not be longer than one year.  The United States, in its sole discretion, may approve an extension of the term of the portion of this supply

agreement relating the machined housings for the AC generators and any other products covered to for a period of up to one year.  If the Acquirer of the Electrical Power Divestiture Assets seeks an extension of the term of this supply agreement, it shall so notify the United States in writing at least four months prior to the date the supply agreement expires.  If the United States approves such an extension, it shall so notify the Acquirer of the Electrical Power Divestiture Assets in writing at least three months prior to the date the supply agreement expires.  In the alternative, at the option of the Acquirer of the Electrical Power Divestiture Assets, UTC shall provide the Acquirer of the Electrical Power Divestiture Assets the manufacturing know-how sufficient to enable the Acquirer of the Electrical Power Divestiture Assets to manufacture the machined parts necessary to fulfill the contractual obligations of the Acquirer of the Electrical Power Divestiture Assets that exist on the date the Electrical Power Divestiture Assets are divested.

O.      At the option of the Acquirer of the Electrical Power Divestiture Assets, UTC shall enter into an agreement to supply maintenance services for the Tornado aircraft secondary power system equipment sufficient to meet the needs identified by the Acquirer of the Electrical Power Divestiture Assets.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to market conditions for these products.  The terms and conditions of any such supply agreement shall be subject to the approval of the United States, in its sole discretion.  At the option of the Acquirer of the Electrical Power Divestiture Assets, this supply agreement may remain in effect  until December 31, 2013.

P.      At the option of UTC, the Acquirer of the Electrical Power Divestiture Assets shall enter into an agreement to supply maintenance, repair, and overhaul services to UTC to enable UTC to provide and support the engine starter motor on the Rolls-Royce Gnome turboshaft engine.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to market conditions for these products.  The terms and conditions of any such supply agreement shall be subject to the approval of the United States, in its sole discretion.  At the option of UTC, this agreement may remain in effect so long as five or more aircraft equipped with a Rolls-Royce Gnome turboshaft engine are in service.

Q.      At the option of UTC, the Acquirer of the Electrical Power Divestiture Assets shall provide UTC with a non-exclusive license for intellectual property that is included in the Electrical Power Divestiture Assets but also is used for both aircraft electrical generation systems and electrical distribution systems and other Goodrich products not being divested pursuant to this Final Judgment.  UTC shall not transfer the license described in this paragraph except as part of a sale of the business in which the license is used.  UTC shall not use the license described in this paragraph for aircraft electrical generation systems and electrical distribution systems.  The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to market conditions for these products.  The terms and conditions of any such license shall be subject to the approval of the United States, in its sole discretion.

R.      Unless the United States otherwise consents in writing, the divestiture of the Electrical Power Divestiture Assets pursuant to Section V or by the Divestiture

Trustee appointed pursuant to Section VII of this Final Judgment shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Electrical Power Divestiture Assets can and will be used by the Acquirer of the Electrical Power Divestiture Assets as part of a viable, ongoing business that is engaged in the design, development, manufacture, marketing, servicing, distribution, repair, and sale of aircraft electrical generation systems and that the divestiture of the Electrical Power Divestiture Assets will remedy the competitive harm alleged in the Complaint. The divestiture of the Electrical Power Divestiture Assets, whether pursuant to Section V or Section VII of this Final Judgment, shall be made to an Acquirer that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the design, development, manufacture, marketing, servicing, distribution, repair, and sale of aircraft electrical generation systems. The divestiture of the Electrical Power Divestiture Assets shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between the Acquirer of the Electrical Power Divestiture Assets and Defendants give Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

S. Unless Thales acquires the Aerolec Shares pursuant to the Aerolec Shareholders Agreement, the Electrical Power Divestiture Assets and the Aerolec Shares must be divested to the same Acquirer.

## VI.   DIVESTITURE OF THE AEC SHARES
## AND OBLIGATIONS RELATING TO AEC

A.      Defendants are ordered and directed, within one hundred eighty calendar days after the filing of the Complaint in this matter, or five calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the AEC Shares in a manner consistent with this Final Judgment to Rolls-Royce.  If, however, applications seeking approval to assign or transfer the AEC Shares to Rolls-Royce have been filed within the period permitted for the divestiture of the AEC Shares to Rolls-Royce with authorities from which approval for the divestiture of the AEC Shares is required by Rolls-Royce as a condition of closing, but orders or other dispositive actions by such authorities on such applications have not been issued before the end of the period permitted for this divestiture, the period shall be extended with respect to the divestiture of the AEC Shares to Rolls-Royce until ten calendar days after such approvals are received.  Defendants agree to use their best efforts to accomplish the divestiture of the AEC Shares to Rolls-Royce and to seek all necessary approvals as expeditiously as possible.

B.      In the event the AEC Shares are not divested to Rolls-Royce pursuant to paragraph VI(A) of this Final Judgment, Defendants are ordered and directed, within one hundred eighty calendar days after the date that Rolls-Royce waives its option to acquire the AEC Shares pursuant to Clause 9 of the AEC Joint Venture Agreement, or that option lapses or expires, to divest the AEC Shares in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed ninety calendar days in total, and shall notify the Court in such

circumstances.  Defendants agree to use their best efforts to divest the AEC Shares as expeditiously as possible.

C.      Defendants shall offer to Rolls-Royce a new right for a new period in which Rolls-Royce may purchase or acquire the "AM Package" as defined in the "Put and Call Option Agreement relating to the Goodrich engine control systems aftermarket business" dated December 31, 2008, between Rolls-Royce and Goodrich ("Put and Call Option Agreement") at the price determined using the formula set forth in clause (b) of the definition of the "Call Option Price" in the Put and Call Option Agreement, until the earlier of:  (1) December 31, 2023; or (2) the date on which UTC no longer owns or controls substantially all of the Goodrich Aftermarket Business ("Right to Purchase"). Nothing in this Final Judgment shall be construed to:  (1) affect any agreements between UTC and/or Goodrich, on the one hand, and Rolls-Royce, on the other, relating to the option to purchase or acquire the Goodrich Aftermarket Business; (2) impose any obligation on UTC to provide Rolls-Royce any extended payments terms with respect to the Right to Purchase; or (3) restrict in any way UTC's ability to sell the Goodrich Aftermarket Business (in whole or significant part) to a party other than Rolls-Royce.  If at any time during which Rolls-Royce may exercise its Right to Purchase, UTC determines to commence a process to sell all or a significant part of the Goodrich Aftermarket Business to a party other than Rolls-Royce, UTC shall first notify Rolls-Royce of UTC's determination and provide Rolls-Royce with no less than sixty days to exercise its Right to Purchase.  If Rolls-Royce does not exercise its Right to Purchase during such sixty-day period, UTC may agree to and complete such a sale, and the Right to Purchase will be suspended for a period of one year from the date the sixty-day period

expires to allow the completion of such sale.  If UTC ceases its efforts to sell the

Goodrich Aftermarket Business at any time during the one-year period when the Right to

Purchase is suspended, the Right to Purchase ceases to be suspended when UTC ceases

its efforts to sell the Goodrich Aftermarket Business.  If such one-year period expires

without UTC having completed such a sale, then UTC may not again attempt to sell the

Goodrich Aftermarket Business to a party other than Rolls-Royce without first complying

with the procedures set forth in this paragraph.

       D.      Unless the United States otherwise consents in writing, the divestiture of

the AEC Shares pursuant to Section VI or by the Divestiture Trustee  appointed pursuant

to Section VII of this Final Judgment shall be accomplished in such a way as to satisfy

the United States, in its sole discretion, that the AEC Shares can and will be used by the

Acquirer of the AEC Shares to carry out the purpose of AEC in an ongoing and viable

manner and the divestiture of the AEC Shares will remedy the competitive harm alleged

in the Complaint.  The divestiture of the AEC Shares, whether pursuant to Section VI or

Section VII of this Final Judgment, shall be made to an Acquirer that, in the United

States's sole judgment, has the intent and capability (including the necessary managerial,

operational, technical and financial capability) of effectively carrying out the purpose of

AEC.  The divestiture of the AEC Shares shall be accomplished so as to satisfy the

United States, in its sole discretion, that none of the terms of any agreement between the

Acquirer of the AEC Shares and Defendants give Defendants the ability unreasonably to

raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in

the ability of the Acquirer to compete effectively.

**VII.    APPOINTMENT OF DIVESTITURE TRUSTEE**

A.    If Defendants have not divested all of the Divestiture Assets within any of the respective time periods specified in Section IV(A), V(A), and VI(A), they shall notify the United States of that fact in writing at the time the period for the relevant divestiture expires and identify the assets that have not been divested.  Upon application of the United States, the Court shall appoint a Divestiture Trustee selected by the United States and approved by the Court to effect the divestiture of any of the Divestiture Assets that have not been sold during the time periods specified in Section IV(A), V(A), and VI(A).

B.    After the appointment of a Divestiture Trustee becomes effective, only the Divestiture Trustee shall have the right to sell those Divestiture Assets that the Divestiture Trustee has been appointed to sell.  The Divestiture Trustee shall have the power and authority to accomplish the divestiture to an Acquirer or Acquirers acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the Divestiture Trustee, subject to the provisions of Section IV, Section V,  Section VI, Section VII, and Section VIII of this Final Judgment, and shall have such other powers as this Court deems appropriate.  Subject to Section VII(D) of this Final Judgment, the Divestiture Trustee may hire at the cost and expense of UTC any investment bankers, attorneys, or other agents, who shall be solely accountable to the Divestiture Trustee, reasonably necessary in the Divestiture Trustee's judgment to assist in any required divestiture.

C.    Defendants shall not object to a sale by the Divestiture Trustee on any ground other than the Divestiture Trustee's malfeasance.  Any such objections by Defendants must be conveyed in writing to the United States and the Divestiture Trustee

within ten calendar days after the Divestiture Trustee has provided the notice required under Section VIII.

D.      The Divestiture Trustee shall serve at the cost and expense of UTC, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of any of the Divestiture Assets sold by the Divestiture Trustee and all costs and expenses so incurred.  After approval by the Court of the Divestiture Trustee's accounting, including fees for its services and those of any professionals and agents retained by the Divestiture Trustee, all remaining money shall be paid to defendants and the trust shall then be terminated.  The compensation of the Divestiture Trustee and any professionals and agents retained by the Divestiture Trustee shall be reasonable in light of the value of the Divestiture Assets that are being sold by the Divestiture Trustee and based on a fee arrangement providing the Divestiture Trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.      Defendants shall use their best efforts to assist the Divestiture Trustee in accomplishing any required divestiture.  The Divestiture Trustee and any consultants, accountants, attorneys, and other persons retained by the Divestiture Trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Defendants shall develop financial and other information relevant to such business as the Divestiture Trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information and compliance with all export control laws and regulations.  Defendants

shall take no action to interfere with or to impede the Divestiture Trustee's accomplishment of any required divestiture.

F.      After its appointment, the Divestiture Trustee shall file monthly reports with the United States and the Court setting forth the Divestiture Trustee's efforts to accomplish any divestiture ordered under this Final Judgment.  To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court.  Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets being sold by the Divestiture Trustee, and shall describe in detail each contact with any such person.  The Divestiture Trustee shall maintain full records of all efforts made to divest any of the Divestiture Assets.

G.      If the Divestiture Trustee has not accomplished any divestiture ordered under this Final Judgment within six months after its appointment, the Divestiture Trustee shall promptly file with the Court a report setting forth:  (1) the Divestiture Trustee's efforts to accomplish the required divestiture; (2) the reasons, in the Divestiture Trustee's judgment, why the required divestiture has not been accomplished; and (3) the Divestiture Trustee's recommendations.  To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports shall not be filed in the public docket of the Court.  The Divestiture Trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust.  The Court thereafter shall

enter such orders as it shall deem appropriate to carry out the purpose of the Final

Judgment, which may, if necessary, include extending the trust and the term of the

Divestiture Trustee's appointment by a period requested by the United States.

## VIII.   NOTICE OF PROPOSED DIVESTITURE

A.     Within two business days following execution of a definitive divestiture

agreement, Defendants or the Divestiture Trustee, whichever is then responsible for

effecting the divestitures required herein, shall notify the United States and any

Monitoring Trustee of any proposed divestiture required by Section IV, Section V, or

Section VI of this Final Judgment.  If the Divestiture Trustee is responsible, it shall

similarly notify Defendants and the Monitoring Trustee.  The notice shall set forth the

details of the proposed divestiture and list the name, address, and telephone number of

each person not previously identified who offered or expressed an interest in or desire to

acquire any ownership interest in any of the Divestiture Assets, together with full details

of the same.

B.     Within fifteen calendar days of receipt by the United States of such notice,

the United States may request from Defendants, the proposed Acquirer or Acquirers, any

other third party, or the Divestiture Trustee, if applicable, additional information

concerning the proposed divestiture, the proposed Acquirer or Acquirers, and any other

potential Acquirer.  Defendants and the Divestiture Trustee shall furnish any additional

information requested within fifteen calendar days of the receipt of the request, unless the

parties shall otherwise agree.

C.     Within thirty calendar days after receipt of the notice, or within twenty

calendar days after the United States has been provided the additional information

requested from Defendants, the proposed Acquirer or Acquirers, any third party, and the Divestiture Trustee, whichever is later, the United States shall provide written notice to Defendants and the Divestiture Trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to UTC's limited right to object to the sale under Section VII(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or Acquirers or upon objection by the United States, a divestiture proposed under Section IV, Section V, Section VI, or Section VII shall not be consummated. Upon objection by UTC under Section VII(C), a divestiture proposed under Section VII shall not be consummated unless approved by the Court.

## IX.    FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Section IV, Section V, Section VI, or Section VII of this Final Judgment.

## X.    HOLD SEPARATE

Until the divestitures required by this Final Judgment have been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

## XI.    APPOINTMENT OF MONITORING TRUSTEE

A.    Upon the filing of this Final Judgment, the United States may, in its sole discretion, appoint a Monitoring Trustee for the Electrical Power Divestiture Assets, the Aerolec Shares, and/or the AEC Shares, subject to approval by the Court.

B.     The Monitoring Trustee shall have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment and the Hold Separate Stipulation and Order entered by this Court and shall have such powers as this Court deems appropriate.  Subject to paragraph XI(D) of this Final Judgment, the Monitoring Trustee may hire at the cost and expense of Defendants any consultants, accountants, attorneys, or other persons reasonably necessary in the Monitoring Trustee's judgment. These individuals shall be solely accountable to the Monitoring Trustee.

C.     Defendants shall not object to actions taken by the Monitoring Trustee in fulfillment of the Monitoring Trustee's responsibilities under any Order of this Court on any ground other than the Monitoring Trustee's malfeasance.  Any such objections by Defendants must be conveyed in writing to the United States and the Monitoring Trustee within ten calendar days after the action taken by the Monitoring Trustee giving rise to the Defendants' objection.

D.     The Monitoring Trustee and any consultants, accountants, attorneys, and other persons retained by the Monitoring Trustee shall serve, without bond or other security, at the cost and expense of Defendants, on such terms and conditions as the United States approves.  The compensation of the Monitoring Trustee and any consultants, accountants, attorneys, and other persons retained by the Monitoring Trustee shall be on reasonable and customary terms commensurate with the individuals' experience and responsibilities.

E.     The Monitoring Trustee shall have no responsibility or obligation for the operation of Defendants' businesses.

F.      Defendants shall assist the Monitoring Trustee in monitoring Defendants' compliance with their individual obligations under this Final Judgment and under the Hold Separate Stipulation and Order.  The Monitoring Trustee and any consultants, accountants, attorneys, and other persons retained by the Monitoring Trustee shall have full and complete access to the personnel, books, records, and facilities relating to the Electrical Power Divestiture Assets, the Aerolec Shares, and the AEC Shares, subject to reasonable protection for trade secret or other confidential research, development, or commercial information or any applicable privileges.  Defendants shall take no action to interfere with or to impede the Monitoring Trustee's accomplishment of its responsibilities.

G.      After its appointment, the Monitoring Trustee shall file monthly reports with the United States and the Court setting forth the Defendants' efforts to comply with their individual obligations under this Final Judgment and under the Hold Separate Stipulation and Order.  To the extent such reports contain information that the Monitoring Trustee deems confidential, such reports shall not be filed in the public docket of the Court.

H.      The Monitoring Trustee shall serve until the divestitures pursuant to Section V, Section VI, or Section VII of this Final Judgment are finalized.

I.      If the United States determines that the Monitoring Trustee has ceased to act or failed to act diligently, the United States may appoint a substitute Monitoring Trustee in the same manner as provided in this Section.

## XII.    AFFIDAVITS

A.      Within twenty calendar days of the filing of the Complaint in this matter, and every thirty calendar days thereafter until the divestitures have been completed under Section IV, Section V, and Section VI, or Section VII, Defendants shall deliver to the United States and any Monitoring Trustee an affidavit as to the fact and manner of their compliance with Section IV, Section V, and Section VI, or Section VII, of this Final Judgment.  Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in any of the Divestiture Assets, and shall describe in detail each contact with any such person during that period.  Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information.  Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitation on information, shall be made within fourteen calendar days of receipt of such affidavit.

B.      Within twenty calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the United States and any Monitoring Trustee an affidavit that describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section X of this Final Judgment.  Defendants shall deliver to the United States and any Monitoring Trustee an affidavit

describing any changes to the efforts and actions outlined in Defendants' earlier affidavits filed pursuant to this section within fifteen calendar days after the change is implemented.

C.     Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## XIII.   COMPLIANCE INSPECTION

A.     For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice Antitrust Division ("Antitrust Division"), including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

(1)     access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

(2)     to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters.  The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or respond to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.      No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.      If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XIV.   NO REACQUISITION

Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XV.   RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XVI.  EXPIRATION OF FINAL JUDGMENT

Unless this Court grants an extension, this Final Judgment shall expire on December 31, 2023.

## XVII. NOTICE TO THE UNITED STATES

All notifications to the United States required pursuant to this Final Judgment shall be made to the United States Department of Justice, Antitrust Division, Litigation II Section.

**XVIII. PUBLIC INTEREST DETERMINATION**

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date:   May 29, 2013

_____/s/_____
KETANJI BROWN JACKSON
United States District Judge